**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**
**GRAND RAPIDS**

| | |
|---|---|
| **IN THE MATTER OF:**  Michigan Pain Consultants, P.C.    Debtor. | Bankruptcy Case No. 24-01571 Hon. Scott W. Dales Chapter 11 *Subchapter V* |

**DECLARATION OF STACY WARD**
**IN SUPPORT OF DEBTOR'S FIRST DAY PLEADINGS**

In support of the above captioned Debtor's first day pleadings, I, Stacy Ward, declare as follows:

1. Except as otherwise stated herein, I make this declaration upon personal knowledge and, if called as a witness, could competently testify to the facts contained herein.

2. I am the responsible person for the Debtor.

3. On June 12, 2024 (the "Petition Date") the Debtor filed a voluntary petition for relief in this Court under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

4. The Debtor continues to manage and operate its business as debtor-in-possession pursuant to, *inter alia*, § 1184 of the Bankruptcy Code.

5. I have been informed that a Subchapter V Trustee has not yet been appointed or designated in this case.

6. Organized in 1984, Michigan Pain Consultants, P.C. is a comprehensive pain management medical practice with multiple locations in Big Rapids, Greenville, Grand Rapids, Holland, Muskegon, and Wyoming, Michigan. The Debtor takes great pride in its ability to service the community and patients, many of whom receive government assistance.

7. For nearly 40 years, the Debtor's clinicians have devoted themselves to serving the needs of individuals suffering from chronic pain in West Michigan. The Debtor offers an interdisciplinary approach to pain care designed to optimize management of patients' pain, including the integration of medical, diagnostic, and therapeutic services, functional rehabilitation, behavioral management, and education. The Debtor's focus is person-centered and holistic, enabling identification of the varied pain management needs of the individuals under its care to ensure appropriate treatment.

8. Prior to the Petition Date, the Debtor encountered financial difficulties with respect to its debtor/creditor relationships with parties, including 5th/3rd Bank and Medicare (through its agents, including CoventBridge (USA) Inc.). The Medicare determination is on appeal and is a contingent, unliquidated, and disputed liability as of the Petition Date.

9. The Debtor has filed the instant case in an effort to effectively manage the wind down of its practice with a goal of maximizing recovery for the bankruptcy estate and ensuring patient care.

10. In order to minimize the potentially adverse effects of the bankruptcy filing on its business the Debtor has requested first day relief (collectively, the "First Day Motions") that are intended to allow the Debtor to maintain ongoing business operations and fulfill its duties as debtor in possession. The First Day Motions are:

    a. First Day Motion for Entry of Order (A) Authorizing Debtor to Pay Employee Obligations; and (B) Directing Financial Institutions to Honor Outstanding Employee-Obligations Payments (the "Employee Obligations Motion");

b. First Day Motion for Entry of Order Authorizing Continued Use of Debtor's Prepetition Cash Management System, Bank Accounts, and Business Forms (the "Cash Management Motion"); and

c. Motion for Entry of Interim and Final Order Authorizing the Debtor to Use Cash Collateral and Granting Adequate Protection (the "Cash Collateral Motion").

11. The majority of the value of the Debtor arises from its ongoing operations and ability to continue to provide services to patients. Without the authority of the Court granting the relief requested in the First Day Motions, the Debtor would suffer irreparable harm, because it will be forced to immediately shut down. The First-Day Motions seek relief aimed at retaining employees, promoting an efficient and effective bankruptcy, and maximizing the Debtor's rehabilitation efforts.

12. I believe that the relief sought in the First-Day Motions is critical to achieving these goals.

13. The factual information contained in the First-Day Motions is true to the best of my knowledge, information, and belief and as indicated in the previous paragraphs to this Declaration. Any capitalized terms not expressly defined in this Declaration have the meanings given to them in the relevant First-Day Motions.

14. Nothing in this Declaration is intended to be or should be construed as an admission of the validity of debts, obligations, defaults, claims, security interests, liens, or any other rights or interests that may be asserted against the Debtor.

## The Employee Obligations Motion

15. As of the Petition Date, the Debtor employs approximately one hundred thirty-eight (138) employees (collectively, the "Employees") in the ordinary course of its business and incurs

obligations to them for compensation for their services. Approximately one hundred eight (8) of the Employees are paid hourly wages while approximately thirty (30) receive a salary. Nine (9) of the Employees may be insiders, as defined in § 101(31)(B)(vi) of the Bankruptcy Code.

16. The Debtor has costs and obligations with respect to the Employees relating to the period before the Petition Date. Certain of these costs and obligations are due and payable, while others will become due and payable after the Petition Date in the ordinary course of the Debtor's business.

17. Before the Petition Date, and in the ordinary course of its business, the Debtor typically paid obligations relating to wages (the "Wages") bi-weekly on Thursday for the time period ending the immediately preceding Friday. The Debtor pays the wages by direct deposit and uses a payroll service to assist in proper administration.

18. The Debtor is also required by law to withhold from its Employees' Wages applicable amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authority (collectively, the "Taxing Authorities").

19. Furthermore, the Debtor is required to make payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and together with the Withholding Taxes, the "Payroll Taxes").

20. Employees all also entitled to receive paid time off ("PTO"). Per company guidelines, employees must be employed for in excess of ninety (90) days in order to qualify for PTO, of which the maximum of forty (40) hours may be rolled over from year to year. The amount

of permitted PTO varies based upon each Employee's period of service.[1] As of the Petition Date, the Debtor is current with respect to its PTO obligations.

21. Certain Employees may incur various expenses in the discharge of their ordinary duties (the "Reimbursable Expenses"). Because these Reimbursable Expenses are incurred as part of their official duties and in furtherance of the Debtor's business, the Debtor reimburses the Employees in full for these expenses, subject to the submission of proper documentation. To enable the Employees to perform their jobs effectively, the Debtor must continue policies of permitting certain Employees to incur business related expenses and thereafter seek reimbursement of such expenses. In the ordinary course of the Debtor's business, Employees may travel to meet with customers, vendors, or suppliers and are reimbursed for expenses incurred in connection therewith. The Employees may be unwilling or unable to continue these vital business practices if they are not reimbursed for these Reimbursable Expenses, thus irreparably injuring the Debtor's business.

22. In addition to the foregoing and in the ordinary course of its business, the Debtor maintains employee benefit programs (the "Benefits"), for which the Debtor contributes all or a part of the expenses based upon employee class. These Benefits include:

---

[1] Below is a chart of the PTO permitted per Employee period of service:

| Period of Service | PTO entitlement |
|---|---|
| 0-3 years | 10 days per year |
| 3-4 years | 15 days per year |
| 4-5 years | 20 days per year |
| 5-15 years | 25 days per year |
| 15+ years | 30 days per year |

    a. <u>Health Insurance Plans</u>:  The Debtor provides Employees healthcare coverage administered by Priority Health.  The Debtor pays no more than 4.5% of the coverage for healthcare coverage for its Employees.

    b. <u>Dental Insurance Plans</u>: The Debtor provides Employees dental coverage administered by Delta Dental. The Debtor pays approximately 18% of the coverage for dental insurance coverage for its Employees.

    c. <u>Vision Insurance Plans</u>:  The Debtor provides Employees healthcare coverage administered by EyeMed. The Debtor does not pay any portion of the coverage for vision insurance coverage for its Employees.

    d. <u>401(k)</u>:  The Debtor offers all Employees the ability to participate in a 401(k) plan administered through Charles Schwab.

23. Absent the entry of an Order granting the Employee Obligation Motion, for the reasons stated therein and herein, the Debtor and its employees will suffer immediate and irreparable harm.

## The Cash Management Motion

24. Prior to the Petition Date, the Debtor maintained the following deposit accounts at 5th/3rd Bank and Horizon Bank (collectively, the "<u>Prepetition Accounts</u>"):

    a. 5th/3rd Bank (checking account ending 1758); and

    b. Horizon Bank (checking account ending 6675).

25. In the ordinary course of its business, the Debtor utilizes its Prepetition Accounts for all aspects of its operations, including the receipt of Medicare, Medicaid, and insurance reimbursement payments via electronic funds transfers.  Such collections occur on a daily basis in the Prepetition Accounts.

26. The Debtor believes that significant delays in receiving its payments as a result of closing its current Prepetition Accounts will result in serious disruptions to its business operations, and specifically, its ability to receive its ongoing payments from insurance carriers and governmental agencies.

**The Cash Collateral Motion**

27. The following is a summary of facts set forth in the Cash Collateral Motion as well as the relief requested therein. The filed Cash Collateral Motion should be consulted for a complete description of its contents.

28. The Debtor requires use of Cash Collateral to make such payments as are necessary for the continuation of its business, as shown on the exhibit attached the Cash Collateral Motion (the "Budget").

29. The Budget projects the Debtor's anticipated revenue and expenses and demonstrates the amount of funds the Debtor must expend on its operation on a monthly basis to avoid immediate and irreparable harm.

30. Without the ability to make the payments as set forth in the Budget, the Debtor would be unable to continue operating and would be forced to shut down its operations on an emergency basis. A majority of the Debtor's value arises from the on-going operations. Further, an immediate cessation of operation would cause enormous hardship for all of the Debtor's patients. Accordingly, authorizing the Debtor to use its Cash Collateral as set forth in the Budget is in the best interest of all creditors and parties in interest.

31. Before the Petition Date, Fifth Third Bank (the "Bank") filed a UCC-1 financing statement against certain of the Debtor's assets, including its cash collateral. The Debtor anticipates the Bank will assert a security interest in the Debtor's Cash Collateral. The Debtor

further anticipates that the Bank will assert that its security interest and liens have first priority over all other security interests and liens asserted against the Debtor.

32. Before the Petition Date, on March 20, 2024, McKesson Corporation ("McKesson") filed a UCC-1 financing statement against certain of the Debtor's assets, including its Cash Collateral. The Debtor anticipates the McKesson will assert a security interest in the Debtor's Cash Collateral. The Debtor further anticipates that McKesson will assert that its security interest and liens have second priority over all other security interests and liens asserted against the Debtor.

33. The Debtor makes no admission and take no position at this time regarding the validity, enforceability, priority or perfection of any the obligations, security interests and liens that may be asserted by any creditor at this time.

34. The Debtor believes that no entities have an interest in its Cash Collateral other than the Bank and McKesson.

35. Absent the entry of an Order granting the Cash Collateral Motion, for the reasons stated therein and herein, the Debtor will suffer immediate and irreparable harm.

### Conclusion

36. I have read, reviewed, and approved each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare to the best of my knowledge, under penalty of perjury, that the above statements are true and correct.

                    **MICHIGAN PAIN CONSULTANTS, P.C.**

                    By: /s/ Stacy Ward
                    Stacy Ward
      Its:    Responsible Person

Dated: June 12, 2024